IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LORI ANN WOODS,

    Petitioner,                    No. CIV S-03-2418 DFL GGH P

    vs.

GLORIA HENRY, et al.,

    Respondent.                FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges her 1999 conviction for second degree murder (Cal. Penal Code § 187) with a firearm enhancement (Cal. Penal Code § 12022.5). Petitioner challenges her conviction on the following grounds: 1) violation of the double jeopardy; 2) jury instruction error; 3) improper exclusion of evidence; 4) cumulative error.

        After carefully considering the record, the court recommends that the petition be denied.

/////

/////

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. <u>Williams (Terry)</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

In reviewing a state court's summary denial of a habeas petition, this court must "look through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

III. Background

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below:

/////

Two sad and lonely people, both with serious psychological disorders, had a predictably tumultuous relationship from its inception. The victim was diagnosed with depression, obsessive compulsive disorder, nonspecific sexual disorder, and dependent personality disorder. Defendant, who had been obese since adolescence, was diagnosed with posttraumatic stress disorder and depression. In their case, misery seemed to crave company.

When they met in 1991, defendant had graduated from college and worked in histology, the study of human tissues. She earned twice as much as the victim, who at that time cleaned automobiles. She had never dated before; he had relied on pornography for sexual gratification. In fact, the victim's obsession led him to compulsively purchase pornographic magazines and videotapes and to engage in phone sex. She was outraged by his obsession, his persistent lying to cover up, and the exorbitant amount of money he surreptitiously spent. Eventually, they both sought counseling.

They stayed together through thick and thin. She paid many of his debts but eventually declared bankruptcy. He got a better paying job and started taking college courses. She had difficulty with a supervisor at work and filed a workers' compensation claim for a stress induced medical disability. By then, they were living together and planning a family. They stopped counseling. During her disability leave, defendant got pregnant, she and the victim got married, and her parents bought them a house next door to them. But all was not well.

They had horrible fights over his ongoing use of pornography, his habitual procrastination, and his submissiveness. Defendant resented the victim's irresponsibility and his inability to stand up for himself. Nevertheless, she felt that the time after the baby was born was the happiest period of her life. It certainly was not for him.

He complained about a lack of attention and their then nonexistent sex life. According to the victim, she doted on her "precious baby." By the time their son was three months old, the victim was angry and his preexisting disorders were exacerbated.

At 1:15 a.m. on November 29, 1995, a neighbor heard three gunshots. At 2:00 a.m., defendant went next door and awoke her mother with the news that she had shot and killed the victim. According to defendant, she found the victim with his hand holding his penis over the baby, who was bare bottomed and whimpering. After she demanded that he leave, the victim purportedly retrieved his gun, threatened to kill her, and later came after her with a hammer. Knowing the baby would be taken away from her, she asked her mother to help her get rid of the body. Her mother called a friend, who called the police.

The officers found the corpse on a tarp near the front door. He had been shot in the left armpit, left side, left buttocks, and in the back. He had a bruise on his cheek and a U-shaped abrasion on his chest. Near the corpse were disposable gloves, towels, a bottle of cleanser, and a large plastic garbage bag. Next to the tarp were women's bloodstained shoes and a pair of cotton gloves. A .357 magnum handgun loaded with two live rounds and four empty casings lay cocked on a washcloth on the kitchen counter.

There was a significant amount of blood in the den where the victim had been shot. Some of the walls had been wiped down. The bed had been stripped. There were vinyl gloves, a blood soaked shoe cover, a cotton glove, and a hospital disposable pad lying on the bed. A hammer lay on a desk near an unhung picture leaning against the wall.

More cleaning supplies and bloodstained clothes were found in the master bathroom. The telephone cord was unplugged and the telephone sat on a built-in desk. An empty six-round package of MagSafe Ammo lay in a small cardboard box inside the bathtub. A gun cleaning kit was on a shelf in the closet.

Defendant's truck was backed into the garage. There were two large plastic garbage bags containing bloody bedding in the bed of the truck.
Neither defendant nor the baby suffered any observable injuries, although the baby had some redness in the genital area.

**The Prosecution's Case**

The prosecution relied on circumstantial evidence that defendant intended to kill the victim. Both sides put an advocate's spin on the psychological dynamics between the two and how their respective pathologies were likely to have impacted their behavior on the night of the shooting. The prosecution emphasized the inconsistencies in defendant's various accounts of what occurred, the improbability of her story given the forensic evidence introduced at trial, and her possible motives.

The prosecution presented defendant as a dominating woman who attempted to control every aspect of her submissive husband's life. The prosecutor argued that the victim, suffering as he did from an obsessive dependency on defendant and terrified of being abandoned, would not have assaulted her physically, threatened her with a gun, or come after her with a hammer. The behavior defendant described was, according to the prosecution, completely inconsistent with his disorder and the history of his role in the relationship. Nor was there any evidence to suggest that the victim would act out sexually on a male child. There was nothing in his therapy or his past to suggest a tendency toward pedophilia or homosexuality.

The prosecution introduced evidence that the victim told a manager of the body shop where he worked that his wife wanted him to buy a gun for protection. The victim himself showed no interest in or affinity toward firearms. He purchased a gun with money he had withdrawn from an ATM machine near the body shop. The prosecution also introduced evidence of the considerable life insurance the couple had purchased on the victim's life. In October 1993 they purchased a universal life policy for $65,000, in September they purchased term insurance of $400,000, and in December 1994 they purchased an additional policy for $400,000.

**The Defense**

Defendant testified at trial. She explained in detail the terrifying events that led up to the fatal shooting. It began with yet another argument over the amount of

5

> attention she was giving to the baby at the victim's expense. She then bathed, nursed the baby, and went to bed until she was awakened by the baby's crying. That is when she found the victim with his penis in his hand over the baby. She told him he was sick and had to leave. He lost control. She had never seen him so angry. When he went into the closet in the master bedroom, she assumed he was packing to leave, but he emerged instead with a small bag containing handcuffs, a rope, and a gun. Defendant did not know there was a gun in the house.
>
> He loaded the gun and threatened to kill her. He pushed her against the wall, cocked the gun, and held it against her head, threatening to "blow [her] brains out." She claimed he then unplugged the phone cord and placed the phone back on the desk before leaving the room. She tried twice to escape with the baby, but each time he caught her, pushed her around, and struck her.
>
> The victim went into the den, which also contained a bed. Defendant put on gloves before entering that room to retrieve the gun, purportedly because she was afraid to touch the gun. As soon as she grabbed the gun, he turned and said, "that's it, bitch, I warned you," then flew at her. She claimed the gun "went off." He growled and came at her again with the hammer in his left hand. She pleaded with him to stop, but when he did not, she fired again. She remembers firing a third shot but not a fourth. He leaned against the closet door and fell. She grabbed the bedding off the bed to try to stop the bleeding, but he died.
>
> Frantic to make it all go away, defendant began cleaning up. Overwhelmed and hysterical, she left the job unfinished and sought her mother's help. Her mother called a friend, who called the police.
>
> Defense counsel argued that defendant may have been hypervigilant and easily startled because she had been molested by a horse trainer when she was 13 and she had been the victim of an attempted rape when she was 19 or 20. He emphasized that defendant had been diagnosed by a counselor and a psychologist as suffering from posttraumatic stress disorder. He portrayed a mother who, after the birth of her first child, was happier than she had ever been in her life. She loved her husband and had a supportive family, a good job, and a bright financial future, particularly with the subsidies her parents provided.
>
> In closing argument, defense counsel insisted that defendant acted in genuine fear of her life and that of her baby's when she shot and killed her husband. Her behavior following the shooting evidenced hysteria and panic and a mother's terror at the prospect of losing her baby.

Respondent's Lodged Document no. 4, opinion of California Court of Appeal, pp. 1-7.

IV. <u>Analysis</u>

    A. <u>Double Jeopardy</u>

Petitioner raised this claim in her direct appeal. The California Court of Appeal issued a reasoned decision addressing this claim. Respondent's Lodged Document No. 4. The

6

California Supreme Court denied this claim without comment. Respondent's Lodged Document No. 6. Accordingly, this court looks through the California Supreme Court's summary disposition of this claim to the opinion of the California Court of Appeal to determine whether the denial of this claim was an unreasonable application of clearly established Supreme Court authority.

Petitioner argues that the litigation of her financial motive violated the Double Jeopardy Clause. The background to this claim is as follows. Petitioner was originally charged with murder, personal use of a firearm and the special circumstance of murder for financial gain. CT at 19-20. After deliberating for approximately five days, the jury from petitioner's first trial informed the court that it was deadlocked. CT at 551. The jury informed the court that it had voted to acquit petitioner as to first degree murder but was deadlocked as to second degree murder. CT at 559-560.

Prior to petitioner's second trial, defense counsel moved to dismiss the first degree murder charge against petitioner on double jeopardy grounds. CT at 521-546. The court granted this motion. CT at 579-585. The case then proceeded to trial on a charge of second degree murder.

At the beginning of petitioner's second trial, petitioner's counsel moved to exclude evidence regarding the life insurance policies on Randy on double jeopardy grounds. RT at 89-90. The court denied the motion and ordered that the insurance evidence was admissible on the issue of motive. RT at 95.

"'[I]t has long been settled under the Fifth Amendment that a verdict of acquittal is final, ending a defendant's jeopardy, and even when not followed by any judgment, is a bar to a subsequent prosecution for the same offence.'" Stow v. Murashige, 389 F.3d 880, 888 (9th Cir. 2004) (quoting Green v. United States, 355 U.S. 184, 188, 78 S.Ct. 221 (1957)). The Fourteenth Amendment incorporates protection from double jeopardy against the states. Benton v. Maryland, 395 U.S. 784, 795-96, 89 S. Ct. 2056 (1969).

7

1    The Supreme Court in <u>Ashe v. Swenson</u>, 397 U.S. 436, 445-46, 90 S.Ct. 1189,
2  1194-95 (1970), held that the Double Jeopardy Clause embodies the doctrine of collateral
3  estoppel.  Collateral estoppel "means simply that when an issue of ultimate fact has once been
4  determined by a valid and final judgment, that issue cannot again be litigated between the same
5  parties in any future lawsuit."  <u>Id.</u> at 443, 90 S. Ct. at 1194.  <u>Ashe</u> involved the robbery of six
6  men at a poker game.  <u>Id.</u> at 437, 90 S. Ct. at 1191.  The defendant was first tried for the robbery
7  of one of these six men; the only issue in dispute was whether the defendant had participated in
8  the robbery.  <u>Id.</u> at 438, 90 S. Ct. at 1191.  A jury acquitted the defendant in this first trial
9  because the evidence linking him to the crime was weak.  <u>Id.</u> at 439, 90 S. Ct. at 1192.  However,
10 the prosecution later charged the same defendant with the robbery of another of the six victims
11 and this time obtained a conviction with improved eyewitness testimony.  <u>Id.</u> at 439-40, 90 S. Ct.
12 at 1192-93.  The Supreme Court reversed the defendant's conviction because the second jury
13 could have convicted the defendant only by finding an ultimate fact—that defendant was one of
14 the robbers in a manner contradicting the finding of the first jury.  <u>Id.</u> at 445, 90 S. Ct. at 1195.

15   In the instant case, petitioner argues that the prosecutor should not have been
16 allowed to introduce evidence of financial motive at her second trial because this was an ultimate
17 fact that had been determined in her favor by the first jury.  In particular, petitioner contends that
18 the prosecution's sole first degree murder theory at the first trial was financial motive.  Petitioner
19 argues that admission of the insurance evidence at her second trial violated her constitutional
20 right to collateral estoppel because the first jury's rejection of premeditation necessarily
21 encompassed rejection of the financial motive theory.  Petitioner argues that first degree murder
22 could not have been unanimously rejected without the jury deciding whether the prosecution's
23 financial motive theory was true.  Petitioner contends that while the jury could, in theory, have
24 found her guilty of premeditated murder on grounds other than the insurance money, it could not
25 have acquitted her without reaching the factual question regarding insurance.  In support of this
26 \\\\\

claim, petitioner has attached to her traverse the transcript of the closing arguments from her first trial.

"Constitutional collateral estoppel exists where 'a fact necessarily determined in the defendant's favor by his earlier acquittal [makes] his conviction on the challenged second trial...impossible unless the fact could be relitigated and determined adversely to the defendant.' On the other hand, 'double jeopardy guarantees are not engaged by collateral estoppel which, if applied would merely restrict proof but not make conviction impossible.'" United States v. James, 109 F.3d 597, 601 (9th Cir. 1997) (quoting Pettaway v. Plummer, 943 F.2d 1041, 1046 (9th Cir. 1991), overruled on other grounds by Santamaria v. Horsley, 133 F.3d 1242, 1245-47 (9th Cir. 1998) (en banc)). See also Dowling v. United States, 493 U.S. 342, 348, 110 S. Ct. 668 (1990) clarifying that the prior acquittal must have determined an ultimate issue in the prior case. The Ninth Circuit has assessed Dowling vis-a-vis Ashe:

> The Supreme Court held that this evidence was not barred by collateral estoppel.
>
> The Court assumed Dowling's acquittal established that there was reasonable doubt as to whether he was the masked man that entered Mrs. Henry's home. "But to introduce evidence on this point at the bank robbery trial, the Government did not have to demonstrate that Dowling was the man who entered the home beyond a reasonable doubt...." Id. at 348, 110 S.Ct. 668. At the bank robbery trial, the evidence of the burglary was introduced under Federal Rule of Evidence 404(b), which allows evidence of prior similar bad acts to show a pattern from which "the jury can reasonably conclude that the act occurred and that the defendant was the actor." Id. (internal quotation marks omitted). "Because a jury might reasonably conclude that Dowling was the masked man who entered Henry's home, even if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged at the first trial, the collateral-estoppel component of the Double Jeopardy Clause is inapposite." Id. at 348-49, 110 S.Ct. 668. The Court held that the case fell within the rule that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." Id. at 349, 110 S.Ct. 668. In *Seley*, we explained this distinction between *Ashe* and *Dowling*:
>
>> *Dowling* did not alter *Ashe* so much as it introduced a new perspective on the meaning of the "ultimate fact" decided in the first trial. Instead of meaning

> that certain acts did not happen, an acquittal means that they were not proved beyond a reasonable doubt. If an act that could have been proved to a lesser degree than that required for conviction is for some reason probative in a subsequent trial, it need not be excluded because of the prior acquittal. 957 F.2d at 723.

Charles v. Hickman, 228 F.3d 981, 986 (9th Cir. 2000).

Petitioner's argument is flawed because, as noted by the California Court of Appeal, the prosecution in the first trial presented evidence that petitioner had several possible motives. During his closing argument in the first trial, the prosecutor argued that petitioner was motivated to kill Randy because she was dissatisfied with the relationship. In particular, the prosecutor argued that petitioner did not like that Randy procrastinated, viewed pornography, was insensitive to her needs and did not earn very much money. See Petitioner's Traverse, RT at 33-46. The prosecutor argued that petitioner took out the life insurance policies based on her dissatisfaction with the relationship:

> Let's just look at the policies that she clearly knew about, the policies she was involved in obtaining. Okay. That's eight hundred and sixty-five thousand dollars that she gets if Randy Smith is dead. And then if Randy Smith is dead, she no longer has to put up with Randy Smith and his pornography and procrastination and everything else, but also, her financial problems go away, and she doesn't have to work.

Id. at 45; see also RT at 94-95.

The California Court of Appeal correctly reasoned,

> Here, the first jury found defendant had not premeditated the murder. That is not to say, however, they unanimously agreed she was not motivated by her desire for financial gain. The prosecution suggested that defendant harbored several possible motives; her desire to collect the insurance proceeds was but one. The trial court pointed out the jurors in the first trial never reached the issue of financial gain because they found defendant not guilty of premeditated murder. As the Attorney General aptly argues: "It is quite possible that the jurors found that, rather than plan the murder, [defendant] simply got fed up with [the victim's] pornography, procrastination, passivity, and low income and decided without premeditation to kill him and at once rid herself of his company and her financial problems." Consequently, according to the Attorney General, the prosecutor was able to present the theory of financial motive to the second jury because it was not an ultimate fact of the murder charge in the first trial.

10

> The acquittal tells us little about the jury's factual findings, either individually or collectively. Any or all of the jurors may have believed defendant had not plotted to kill her husband when she purchased the insurance. But they may have concluded that the existence of the insurance, in conjunction with the burden of the victim's psychological disabilities, did enter into defendant's calculations as she responded to his behavior on the night of the killing. Defendant, therefore, has not sustained her burden of showing that the jury in the first trial "actually decided" she did not kill for financial gain. (Dowling v. United States (1990) 493 U.S. 342, 350 [107 L.Ed.2d 708, 719].)

Respondent's Lodged Document 4, Opinion of California Court of Appeal, pp. 18-19.

The Court of Appeal correctly applied Dowling. All that petitioner's prior acquittal told us was that she could not be convicted of premeditated murder. Even if the insurance motive had been the sole reason for the alleged premeditation (and it was not), the fact that the jury had a reasonable doubt about such motivation in the first trial did not preclude its use in the second trial when the burden of proof to establish motive was different. As discussed, infra, the jury was instructed in petitioner's second trial that motive was not an element of the crime, but it could be used, to explain the circumstances leading to the second degree murder intent to kill. As such, the evidence of "motive" was introduced in much the same fashion as it would be under Fed. R. Ev. 404(b) and Cal. Evidence Code § 1101, and this fact need only have been proven to the jury by a preponderance of the evidence. Charles, supra. The differing burdens of proof under the "insurance only as motive" scenario would permit use of the insurance motive in the second trial.

Of course, if the alleged motives in the first trial were numerous, the jury's acquittal of premeditated murder would tell us nothing about which motive was established by a preponderance of the evidence, but nevertheless was insufficient to establish premeditation beyond a reasonable doubt.

In addition, even if in petitioner's second trial collateral estoppel barred evidence relating to the insurance, the doctrine would have restricted proof; it would not have made conviction impossible. In other words, to find beyond a reasonable doubt that petitioner was guilty of second degree murder the jury was not required to find petitioner had taken out life

insurance policies on Randy. The jury in petitioner's second trial heard substantial evidence of petitioner's motive: Randy's use of pornography, his procrastination, his insensitivity, his failure to earn very much money. RT 2313 (prosecutor's closing argument). The physical evidence did not support petitioner's story of self-defense.[1] Based on this evidence, the jury in the second trial could find, beyond a reasonable doubt, that petitioner committed second degree murder.

For the reasons discussed above, the court finds that the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

B. Right to Present a Defense

Applying state law only, the California Court of Appeal found that petitioner's right to present a defense was violated. Applying federal and state law, the California Court of

---

[1] Other than petitioner's testimony, no evidence was presented that Randy molested Jordan. The physical exam of Jordan did not reveal evidence of molestation (RT at 1395-1400), and evidence was presented that Randy did not have a sexual interest in children. RT 1059 (testimony by petitioner's half-brother that petitioner's pornography did not involve children); RT at 1196 (testimony by Randy's therapist that Randy's mental health problems did not include pedophilia). Petitioner's testimony that she did not know about the gun was also not well supported. RT 1054-55 (Randy's manager testified that approximately 6 weeks before the murder, Randy told him that petitioner wanted a gun for protection); RT 1731, 1991 (petitioner's testimony that she was a meticulous housekeeper was not consistent with her claim that she was not aware of the gun and gun cleaning kit in the master bedroom closet). Petitioner's careful attempt to clean up the crime scene also did not support her story. RT at 1288-1336 (description of crime scene by Officer Gardner, including testimony that the bed had been stripped of bloody linens, pickup truck backed into garage, etc). Testimony was also presented indicating that Randy was dressed for bed at the time of the murder, i.e. he was wearing his bed clothes (sweat pants and t-shirt) and his "day clothes" were on the floor near the bed. RT 1318, 1456. This evidence undercut petitioner's story regarding Randy's conduct on the night of the murder. The forensic evidence also undercut petitioner's story. RT at 1466-1483 (Randy was shot four times, three times within intermediate range meaning from a few inches away to a foot away. Two of the shots were in his back. The trajectory of the shots also did not support petitioner's version of events). Evidence was presented that petitioner had no visible physical injuries following the shootings such as bruising, despite her testimony that Randy had pushed her around. RT at 1576-1579 (testimony of Nurse who examined petitioner at the jail). In its rejection of petitioner's claim alleging violation of her right to present a defense, set forth infra, the California Court of Appeal discussed other evidence that did not support petitioner's version of events: she put gloves on before she picked up the gun, she testified that Randy came at her with the hammer in his left hand although he was right handed, etc. While other evidence also undercut petitioner's story, the court need not examine the evidence in further detail.

Appeal went on to find harmless error.  The California Supreme Court denied petitioner's petition for review without comment.

Having independently reviewed the record, as there is no reasoned state court decision applying federal standards, this court finds that the state court's finding that petitioner's right to present a defense was violated.  As will be discussed below, the court will apply AEDPA deference to the state appellate court's harmless error conclusion because this finding was based on application of federal law.

Petitioner argues that the trial court violated her right to present a defense when it excluded evidence regarding Randy's character.  The California Court of Appeal rejected this claim:

> Defendant proffered the testimony of one of her neighbors, who would have testified that one of her first encounters with the victim was rather startling. When she walked outside to turn on her water, "he came over to the fence and he screamed, screamed at me and said, 'Turn off your God Damn water.'" He had planted a new lawn and was afraid the neighbor's watering was going "to wreck our seeded lawn."  About two weeks later, the victim knocked on her door and screamed at her again, stating, "You know your God Damn water is wrecking my lawn.  I want you to keep it off from now on."  After she informed him she had to water her lawn in the heat, he just left. They never spoke to one another again.
>
> The court found the evidence was not relevant.  The court explained: "Well, based on what the Court's heard so far, the response and the testimony was clear it was an oral challenge, and he simply walked away in each instance and did not pursue it. [¶] And I think that really being loud and perhaps using swear words, while not certainly appropriate conduct, is not that probative. [¶] ... [¶] And under Evidence Code Section 352 it's my opinion that its prejudicial effect outweighs its probative effect to the extent it has any, and therefore, that was the Court's ruling.  It's not relevant."
>
> A criminal defendant has a constitutional right to present all relevant evidence of significant probative value in his favor.  (People v. Jennings (1991) 53 Cal.3d 334, 372.)  "'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of significant probative value to his defense.'" (People v. Greenberger (1997) 58 Cal.App.4th 298, 352.)  Defendant asserts her neighbor's testimony was significantly probative because the prosecution depicted the victim as a passive, nonviolent person who would not have behaved as defendant testified, and the proffered evidence indicated that, in fact, the victim had reacted angrily and was verbally abusive over what appeared to be a minor incident involving watering the lawn.  We agree.

13

The prosecution went to great lengths to portray the victim as docile and submissive. His counselor explained that the victim, as is typical of those who suffer from a dependent personality disorder, feared abandonment and suppressed articulation of his own needs. In short, he would not show anger. Yet the essence of the defense was defendant's claim that the victim had become so enraged he threatened to kill her. Hence, any demonstration of anger was certainly probative of how he might have reacted on the night of the shooting.

The trial court minimized the probative value because the victim had not directed any violence toward the neighbor. The court determined that anger does not translate into a propensity for violence. The correlation between the victim's anger and the credibility of defendant's story was for the jury to assess. But we disagree with the court that the evidence was of little, if any, probative value. It was in fact the *only* evidence offered to corroborate defendant's depiction of the victim as aggressive and potentially abusive. Because the evidence would have consumed a minuscule amount of time and supported the defense theory, we conclude the trial court abused its discretion by withholding evidence of significant probative value in defendant's favor.

Nevertheless, the error was harmless by any measurement. (Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705]; People v. Watson (1956) 46 Cal.2d 818.) While the testimony was probative, it certainly was not compelling. The prosecution's case was. While the circumstantial evidence of the couple's dysfunctional coping mechanisms was informative, there was evidence that was much more damning. For example, defendant made sure she put gloves on before picking up the gun, a fact that severely diminishes her claim that she feared imminent death. Similarly, she insisted she shot the victim as he lunged at her with a hammer. Yet two of the shots were fired at the victim's back. And although she had previously testified that the right-handed victim came at her with the hammer in his left hand, at trial she testified for the first time that the victim was ambidextrous. Moreover, she made several allegations that the victim had struck or shoved her and yet she had no marks or injuries. A person who nearly escapes death by self-defense is unlikely to spend 45 minutes frantically cleaning up the mess, putting the corpse on a tarp, and placing the bloody bedding in the rear of the truck she had backed into the garage before summoning help.

We simply cannot find that the neighbor's testimony about the victim's shouting at her would have made any difference in the outcome of the case. Defendant's behavior was not consistent with her claim of self-defense even if we assume the victim became angry and lost control.

Since she offered no other evidence that the victim behaved violently, we conclude it is not reasonably probable that a jury would have acquitted defendant of second degree murder based on the admission of the evidence of the neighborhood spat, however inappropriate or uncouth. Moreover, we conclude the error was harmless beyond a reasonable doubt.

Respondent's Lodged Document 4, Opinion of California Court of Appeal, p. 11-14.

\\\\\

"[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142 (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528 (1984.)) "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973). "'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense–a right to his day in court–are basic in our system of jurisprudence...'" Id., 93 S. Ct. at 1045 (quoting In re Oliver, 333 U.S. 257, 273, 68 S. Ct. 499 (1948)).

The California Court of Appeal found that the exclusion of the neighbor's testimony violated petitioner's right to present a defense, but that the error was harmless. Under AEDPA, this court must defer to this holding unless it was in "conflict with the reasonings or holdings of Supreme Court precedent" or if it "applied harmless-error review in an 'objectively unreasonable' manner." Mitchell v. Esparza, 540 U.S. 12, 17, 18, 124 S. Ct. 7, 11-12 (2003); Inthavong v. Lamarque, 420 F.3d 1055, 1058-59 (9th Cir. 2005). If this court determines that the state court's harmless error holding is contrary to Supreme Court precedent or objectively unreasonable, then no deference is owed. Inthavong, 420 F.3d at 1059. This court would then apply the harmless error analysis as described in Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710 (1993): errors are harmless if they do not have a "substantial and injurious effect or influence in determining the jury's verdict." Id.

In this case, the California Court of Appeal applied the harmless error set forth in Chapman v. State of California, 386 U.S. 18, 87 S. Ct. 824 (1967): for a federal constitutional error to be harmless, it must be harmless beyond a reasonable doubt. Accordingly, the court applies AEDPA deference unless the state appellate court's application of this standard was objectively unreasonable.

After reviewing the record, the court finds that the California Court of Appeal's application of Chapman was not objectively unreasonable. The California Court of Appeal

15

found that admission of the neighbor's testimony regarding Randy's outburst would not have made any difference in the outcome of the case because the evidence presented by the prosecution was compelling. This court agrees with this reasoning. As observed by the state appellate court, no evidence was presented demonstrating that Randy had ever been violent. The prosecution presented a strong case undermining petitioner's claim of self defense.

Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

### C.  Jury Instruction Error

Petitioner raised this claim in her habeas corpus petition filed in the California Supreme Court. Respondent's Lodged Document No. 8. The California Supreme Court denied this claim without comment. Respondent's Lodged Document No. 9. Because no reasoned state court decision exists denying this claim, this court must conduct an independent review of the record to determine whether the denial of this claim was objectively unreasonable.

A challenge to jury instructions does not generally state a federal constitutional claim. See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985). Habeas corpus is unavailable for alleged error in the interpretation or application of state law. Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480. In order for error in the state trial proceedings to reach the level of a due process violation, the error had to be one involving "fundamental fairness." Id. at 73, 112 S. Ct. at 482. The Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. Id. at 73, 112 S. Ct. at 482.

1         Furthermore, the Supreme Court has recently held that there is no unreasonable

2  application of federal law where a state appellate court decided that a jury instruction's single

3  incorrect statement of the "imperfect self-defense" standard did not render the instruction

4  reasonably likely to have misled the jury.  Middleton v. McNeil, 541 U.S. 433, 124 S. Ct. 1830

5  (2004).

6         Petitioner challenges the reading of CALJIC 2.51 regarding motive:

7> Motive is not an element of the crime charged and need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish the defendant is guilty.  Absence of motive may tend to show the defendant is not guilty.

10 RT at 2275-2276.

11        Petitioner argues that CALJIC No. 2.51 improperly instructed the jury that it could

12 infer guilt directly from motive.  Petitioner argues that each of the other two instructions covering

13 a specific evidentiary circumstance included an admonition that it was insufficient to establish

14 guilt.  For example, the jury was instructed that faslehoods by the defendant may tend to prove

15 consciousness of guilt, but was cautioned that "that conduct is not sufficient by itself to prove

16 guilt."  RT at 2272.

17        In People v. Snow, 30 Cal.4th 43, 97-98, 132 Cal. Rptr. 2d 271, 310 (2003) the

18 California Supreme Court rejected this argument:

19> Defendant complains that CALJIC 2.51, which, as given, stated that motive "is not an element of the crime charged and need not be shown," but that its presence "may tend to establish guilt," did not further caution the jury the proof of motive alone was insufficient to establish guilt. [¶] If the challenged instruction somehow suggested that motive alone was sufficient to establish guilt, defendant's point might have merit.  But in fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish all the elements of murder.  When CALJIC 2.51 is taken together with the instruction or the concurrence of act and specific intent (CALJIC 3.31) and the instruction outlining the elements of murder and requiring each of them to be proved in order to prove the crime (CALJIC 8.10), there is no reasonable likelihood [citation] it would be read as suggesting that proof of motive alone may establish murder.

26 Id.

In the instant case, the jury was instructed with CALJIC 3.31.5 which provided that "in the crime charged, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless this mental state exists the crime to which it relates is not committed." CT at 718. The jury was also instructed with CALJIC 8.10 as to the elements of murder. CT at 732.

This court agrees with the California Supreme Court's reasoning in Snow that taken together with the other instructions, there is no reasonable likelihood that the jury would have understood CALJIC 2.51 to mean that proof of motive alone may establish murder. For this reason, the reading of CALJIC 2.51 did not violate fundamental fairness.

After independently reviewing the record, the court finds that the California Supreme Court's denial of this claim was not objectively unreasonable. Accordingly, this claim should be denied.

### D. Cumulative Error

Petitioner raised this claim in her habeas corpus petition filed in the California Supreme Court. Respondent's Lodged Document No. 8. The California Supreme Court denied this claim without comment. Respondent's Lodged Document No. 9. Because no reasoned state court decision exists denying this claim, this court must conduct an independent review of the record to determine whether the denial of this claim was objectively unreasonable.

Petitioner argues that the cumulative effect of the errors alleged in this petition rendered her trial fundamentally unfair. The cumulative error doctrine provides that "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996)). In the absence of a specific constitutional violation, habeas review of trial error is limited to whether the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974).

As discussed above, the reading of CALJIC 2.51 was proper. In addition, the admission of the insurance evidence did not violate constitutional collateral estoppel. The one error found in petitioner's trial, i.e. exclusion of the neighbor's testimony, was found harmless. Under these circumstances, there can be no cumulative error.

Even assuming that the insurance evidence was improperly admitted and that CALJIC 2.51 should have been more clear, combined with the error regarding the exclusion of the neighbor's testimony, these cumulative errors were not so prejudicial as to require reversal. As discussed above, the prosecution presented a substantial case against petitioner. Her claim of self-defense was undermined by the evidence. Even with these alleged errors, the jury had sufficient evidence on which to convict petitioner of second degree murder.

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not objectively unreasonable. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

\\\\\
\\\\\
\\\\\
\\\\\
\\\\\

1 that failure to file objections within the specified time may waive the right to appeal the District
2 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3 DATED: 2/16/06

5 /s/ Gregory G. Hollows

6 GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

8 ggh:kj
woods2418.157